EXHIBIT A

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | | |
|---|---|---|
| DCM Group, Inc., et al., | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  2:17-CV-740 |
| Ebix, Inc. | ) | |
| *Defendant* | ) | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  Ebix, Inc.

*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

### Why are you getting this?

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within   30   days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent.  Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

### What happens next?

If you return the signed waiver, I will file it with the court.  The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you.  And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:      08/22/2017

/s/ Albert J. Lucas
*Signature of the attorney or unrepresented party*

Albert J. Lucas
*Printed name*
Calfee, Halter & Griswold LLP
1200 Huntington Center - 41 S. High St.
Columbus, OH 43215
*Address*

alucas@calfee.com
*E-mail address*

614.621.1500
*Telephone number*

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | | |
|---|---|---|
| DCM Group, Inc., et al., | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  2:17-CV-740 |
| Ebix, Inc. | ) | |
| *Defendant* | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To:  Albert J. Lucas
    *(Name of the plaintiff's attorney or unrepresented plaintiff)*

    I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

    I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

    I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

    I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from         08/22/2017       , the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

    Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

    "Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

    If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

    If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | | |
|---|---|---|
| DCM Group, Inc., et al., | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 2:17-CV-740 |
| Ebix, Inc. | ) | |
| *Defendant* | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To: Albert J. Lucas
     *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from     08/22/2017    , the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DCM GROUP, INC.<br>c/o Phani Kumar Chaluvadi<br>563 Broad Street<br>Newark, NJ 07102<br><br>and<br><br>Phani Kumar Chaluvadi<br>121 Rolling Brook Drive<br>Edison, NJ 08820<br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br>EBIX, INC.<br>1 Ebix Way<br>Johns Creek, GA 30097<br><br><div align="center">Defendant.</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 2:17-cv-740<br><br>JUDGE<br><br><br>**COMPLAINT**<br><br>**(JURY DEMAND ENDORSED HEREON)** |

Plaintiffs DCM Group Inc. ("DCM") and Phani Kumar Chaluvadi ("Chaluvadi") (collectively, "Plaintiffs") allege and state the following against Defendant Ebix, Inc. ("Ebix"):

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff DCM is a New Jersey corporation with its principal place of business in New Jersey. DCM conducts business on a worldwide basis, including within the Southern District of Ohio.

2. Plaintiff Chaluvadi is an individual residing in New Jersey.

3. Defendant Ebix is an Illinois corporation with its principal place of business in Atlanta, Georgia.

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000, and this matter is between citizens of different states.

5. This Court may exercise personal jurisdiction over Ebix as a result of Ebix transacting business in the State of Ohio, engaging in persistent course of conduct in the State of Ohio and/or having sufficient minimum contacts with the State of Ohio.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the event and/or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTS COMMON TO ALL CLAIMS

7. This is an action by Plaintiffs against Ebix to recover money damages arising out of the breach by Ebix of a written asset purchase agreement and the breach by Ebix of an oral agreement regarding new Ebix acquisitions facilitated by Chaluvadi.

8. In 2014, Chaluvadi was the sole shareholder of DCM. At that time, DCM was a software and programming company that sold software and consulting services to customers around the world.

9. In 2014, Chaluvadi was also one of the shareholders of i3 Software Private Limited ("i3"). At that time, i3 was a software and programming company that sold software and consulting services in India and the United States.

10. Ebix is a worldwide supplier of software and consulting services to the financial, insurance, and healthcare industries.

11. In 2014, Ebix, through its President Robin Raina ("Raina"), engaged in discussions with Chaluvadi about Ebix acquiring DCM and i3.

12. During the negotiations, Raina proposed that the acquisition of DCM and i3 would involve upfront payments for both companies along with additional earn out payments based on future sales during the 25-month period after the acquisition.

13. As part of the negotiations, Raina represented to Plaintiffs that the Earn Out was fully achievable based on DCM's and i3's historic sales volumes, and based on the help and support of Ebix and its team of managers and employees.

14. Based on Raina's representations, agreements were signed between Ebix and DCM and between Ebix and i3 for Ebix to acquire DCM and i3. The Agreement between DCM and Ebix is referred to herein as the "DCM Agreement." The Agreement between i3 and Ebix is referred to herein as the "i3 Agreement." The DCM Agreement and the i3 Agreement are sometimes referred to collectively herein as the "Agreements." Copies of the DCM Agreement and the i3 Agreement are attached hereto as Exhibits A and B, respectively.

15. Under the Agreements, the purchase price to be paid by Ebix included upfront payments for DCM and i3, along with Earn Out payments based on the total revenues generated in certain years by Ebix's P&C Consulting Division ("P&C"), of which DCM and i3 became a part following the execution of the Agreements.

16. Specifically, in consideration for purchasing the assets of DCM and i3, Ebix agreed to pay, among other things, (1) an initial purchase price for DCM of one-million-five-hundred-thousand dollars ($1,500,000) and an initial purchase price for i3 of five-hundred thousand dollars ($500,000); (2) an additional Earn Out payment to DCM of one-million ($1,000,000) if P&C's revenue from December 1, 2014 through the end of calendar 2015 met a certain threshold; and (3), an additional Earn Out payment up to four-million dollars ($4,000,000) if P&C's combined

revenue during the 25-month Earn Out period met certain threshold amounts (the Earn Out provisions are collectively referred to herein as the "Earn Out.") *See* DCM Agreement § 3.1.

17. At the time of the sale, DCM's and i3's historical sales volume, their then-current sales capacity and staffing, and conservative sales forecasts for DCM and i3, all indicated that P&C's revenue from DCM and i3 alone would be sufficient to qualify for an Earn Out payment.

18. All such Earn Outs were to be paid by Ebix no later than March 31, 2016 and March 31, 2017, based on P&C's revenue for the relevant period.

19. Ebix has not paid any Earn Out for any year. Nor did Ebix notify Plaintiffs of the total revenue of P&C during all relevant periods.

20. Instead, after paying the initial purchase price amounts and after acquiring DCM's and i3's assets, Ebix repeatedly took actions to interfere with and depress P&C's sales, thus depriving Plaintiffs of the benefit of the Earn Out.

21. Ebix's actions to deprive Plaintiffs of the benefit of the Earn Out include, but are not limited to, the following:

   a. Termination, without cause, of P&C's key sales representatives;

   b. Termination, without cause, of P&C's key programmers and consultants working with P&C's important customers;

   c. Directing P&C not to seek any further business in India, and subsequently arranging for Ebix to enter contracts in India with customers and/or potential customers of DCM and/or i3 to perform software consulting services of the same type offered by DCM and/or i3;

   d. Failing to coordinate sales efforts between P&C and Ebix, despite Ebix's promises to do so;

    e.  Failing to support cross-selling between P&C and Ebix, despite Ebix's promises to do so;

    f.  Refusing to provide Ebix's customer information to P&C to facilitate coordination and cross-selling of products and services; and

    g.  Failing to support P&C sales.

22. But for Ebix' wrongful actions, all of P&C's revenue objectives would have been met and all of the Earn Out requirements would have been achieved.

23. On or about April 13, 2015, Raina and Chaluvadi met in Ebix's offices in India to discuss Ebix's actions which were depressing P&C's sales and preventing the Plaintiffs from achieving the Earn Out. During the meeting, Chaluvadi relayed his dissatisfaction with Ebix's actions and the extent to which Ebix's wrongful conduct were depressing P&C's revenues.

24. In response, Raina told Chaluvadi to stop complaining to Ebix employees and to keep quiet about these issues.

25. In connection with those discussions, and in an apparent effort to offset the harm caused by Ebix, Raina told Chaluvadi that if Chaluvadi could identify additional companies for Ebix to acquire, then DCM and Chaluvadi would benefit from the acquisitions.

26. Raina agreed that the revenues from the newly acquired company or companies would be included in P&C revenues, and thus count towards the Earn Out.

27. Based upon the promises made by Raina, and in exchange for the benefits promised by Raina, Chaluvadi agreed to help introduce acquisition targets to Ebix.

28. Shortly after the meeting in April 2015, Chaluvadi identified PB Systems as an Ebix acquisition target for Ebix. Thereafter, Chaluvadi introduced PB Systems to Ebix.

29. In or about June 2015, Ebix purchased PB Systems.

{04458823.DOCX;2 }

30. Despite Chaluvadi's introduction and facilitation of Ebix's purchase of PB Systems, PB Systems' revenue was never included in P&C's revenue, thus impacting the Earn Out. If PB Systems revenues had been included in P&C's revenues, the Earn Out would have been fully achieved.

31. But for Ebix's wrongful actions, all of P&C's revenue objectives would have been met and all of the Earn Out requirements would have been achieved.

32. In addition to the foregoing, Ebix promised in the DCM Agreement to employ Chaluvadi for calendar years 2015 and 2016 and to enter into a new employment agreement with Chaluvadi for calendar year 2016 that "compensates him suitably as a senior employee."

33. Despite the obligation to enter into a new employment agreement with Chaluvadi for calendar year 2016, Ebix failed to offer such an employment agreement to Chaluvadi.

34. Nor did Ebix compensate Chaluvadi as a "senior employee" in calendar year 2016. Instead, in calendar year 2016, Chaluvadi was paid a "token salary" of $50,000, the same token salary he was paid in 2015.

35. In failing and refusing to enter into an employment agreement with Chaluvadi for calendar year 2016, and in failing and refusing to pay Chaluvadi as a "senior employee" in 2016, Ebix breached the DCM Agreement and the promises Ebix made to Chaluvadi as a third party beneficiary under the DCM Agreement.

36. On December 1, 2016, Ebix terminated Chaluvadi's employment with Ebix. Such termination was one month early and constituted a breach of the DCM Agreement.

## COUNT I—BREACH OF WRITTEN CONTRACT

37. Plaintiffs incorporate by reference the foregoing paragraphs as if fully rewritten herein.

38. The promises and agreements made by Ebix, as referenced in this Complaint, including but not limited to the promises and agreements in the DCM Agreement, formed a binding and valid contract between DCM and Ebix.

39. DCM has fully performed its obligations under the parties' contracts and the DCM Agreement.

40. Ebix has materially breached the parties' contracts and the DCM Agreement by, among other things: (a) terminating P&C's key sales people and key consultants with the intention of depressing P&C's sales; (b) interfering with DCM's right to receive the Earn Out; (c) violating the covenant of good faith and fair dealing by taking actions which depressed DCM's revenues; (d) directing P&C not to seek new sales in India, then arranging for Ebix to enter into contracts in India with customers and/or potential customers of DCM and/or i3 to perform software consulting services of the same type offered by DCM and/or i3; and (e) failing to include PB Systems' revenue in the Earn Out calculation.

41. Ebix has also materially breached the DCM Agreement by failing to enter into a new employment agreement with Chaluvadi in calendar year 2016 that "compensates him suitably as a senior employee" and by terminating him one month before the expiration of the "minimum employment term" ending January 1, 2017. *See* DCM Agreement § 4.4.

42. Ebix's actions have also violated the duty of good faith and fair dealing implicit in the DCM Agreement.

43. As a direct and proximate result of Ebix's breaches of the DCM Agreement, Plaintiffs have suffered damages in an amount to be proven at trial, not less than the full amount of the Earn Out plus the annual salary of the Chaluvadi as a senior employee, which Plaintiffs allege to be in excess of $5,400,0000, plus costs, expenses, and interest.

## COUNT II—BREACH OF ORAL CONTRACT

44. Plaintiffs incorporate by reference the foregoing paragraphs as if fully rewritten herein.

45. In the Spring of 2015, Chaluvadi met with Raina to discuss Chaluvadi's dissatisfaction with certain actions that Ebix was taking regarding P&C's employees and opportunities, which depressed P&C's revenues and interfered with Plaintiffs' opportunity to achieve the Earn Out.

46. In response, Raina told Chaluvadi to stop complaining to Ebix employees and to keep quiet about these issues.

47. In connection with those discussions, Raina also told Chaluvadi that Ebix was interested in making more acquisitions, and another way to achieve the Earn Out was for Chaluvadi to introduce Ebix to other acquisition targets. Raina promised that if Ebix acquired the target, Ebix would include the acquired company in the P&C Division and the acquired company's revenue would count towards the Earn Out calculation. Chaluvadi agreed to find acquisition targets for Ebix in exchange for the inclusion of such company in the P&C Division and inclusion of the acquired company's revenues in the Earn Out. The promises and agreements made in these discussions formed a binding and enforceable contract between the parties.

48. Pursuant to the agreement between the parties, Chaluvadi identified PB Systems as an Ebix target and introduced PB Systems officials to Raina.

49. As a result of Chaluvadi's introduction of PB Systems to Ebix, Ebix acquired PB Systems in or about June of 2015.

50. Chaluvadi fully performed all of his obligations under the agreement.

51. Ebix breached the agreement with Chaluvadi by failing to include PB Systems in the P&C Division and by failing to include PB Systems' revenue in the Earn Out calculation.

52. Upon information and belief, if the PB Systems revenue had been included in P&C's revenues, the full value of the Earn Out would have been achieved. No Earn Out has been paid by Ebix to Plaintiffs.

53. As a result of the foregoing, Plaintiffs have been damaged in an amount to be proven at the trial, not less than the full amount of the Earn Out, which Plaintiffs allege to be in excess of $5,000,000, plus costs, expenses, and interest.

## COUNT III—PROMISSORY ESTOPPEL

54. Plaintiffs incorporate by reference the foregoing paragraphs as if fully rewritten herein.

55. Defendant made a clear and unambiguous promise to Chaluvadi in April 2015 that the revenues from any business identified by Chaluvadi and acquired by Ebix would be included as part of P&C's revenues for purposes of the Earn Out.

56. Chaluvadi relied on these promises to his detriment by introducing PB Systems to Ebix as a potential acquisition target.

57. Chaluvadi's reliance on these promises was reasonable and foreseeable.

58. Defendants have failed to include PB Systems' revenue as part of P&C's revenues, thus negatively impacting the Earn Out calculation.

59. As a result of his reliance on the promises made by Defendant, Plaintiffs have suffered damages in an amount to be proven at the trial, not less than the full amount of the Earn Out, which Plaintiffs allege to be in excess of $5,000,000, plus costs, expenses, and interest.

## COUNT IV—UNJUST ENRICHMENT/QUANTUM MERUIT

60. Plaintiffs incorporate by reference the foregoing paragraphs as if fully rewritten herein.

61. Based upon promises made by Raina to compensate Plaintiffs if Chaluvadi facilitates acquisitions by Ebix, Chaluvadi introduced PB Systems to Ebix as a possible acquisition target.

62. As a result of Chaluvadi's introduction of PB Systems to Ebix, Ebix acquired PB Systems in June of 2015. Since that time, Ebix has benefitted from the PB Systems acquisition.

63. Plaintiffs have not been compensated for their role in introducing PB Systems to Ebix and facilitating Ebix's acquisition of PB Systems.

64. It would be inequitable for Ebix to retain the benefit of the PB Systems acquisition without providing compensation to Plaintiffs. Ebix has thereby been unjustly enriched.

65. By all of the foregoing, Ebix has been unjustly enriched and Plaintiffs are entitled to damages, the amount of which will be proven at trial, not less than the full amount of the Earn Out, which Plaintiffs allege to be in excess of $5,000,000, plus costs, expenses, and interest.

## COUNT V—ACCOUNTING

58. Plaintiffs incorporate by reference the foregoing paragraphs as if fully rewritten herein.

59. Plaintiffs demand an accounting of Ebix's books and records relating to the Earn Out, including all revenues generated by P&C and PB Systems, in order to properly calculate the Earn Out due and owing to DCM.

60. To facilitate an accounting of the Earn Out, and in accordance with the DCM Agreement, Plaintiffs are entitled to audit Ebix's books and records relating to the Earn Out, including all records of revenues of P&C and PB Systems, in order to verify the Earn Out calculation.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant as follows:

A.      On Count I, judgment in favor of Plaintiffs, and an award of damages to DCM in excess of $5,000,000 for the full amount of the Earn Out and damages to Chaluvadi in excess of $400,000 for compensation as a senior employee, plus costs, expenses, and pre- and post-judgment interest.

B. On Counts II, III, and IV, judgment in favor of Plaintiffs, and an award of damages in excess of $5,000,000 for the full amount of the Earn Out, plus costs, expenses, and pre- and post-judgment interest.

C. On Count V, judgment in favor of Plaintiffs and an Order giving Plaintiffs an accounting of Ebix's books and records relating to the Earn Out, including all books and records related to the revenues generated by P&C and PB Systems.

D. That Plaintiffs be awarded their attorneys' fees incurred in prosecuting this action.

E. That Plaintiffs be awarded such other or further relief as may be just and equitable.

Respectfully submitted,

*/s/ Albert J. Lucas*
Albert J. Lucas (0007676)
Jason J. Blake (0087692)
CALFEE, HALTER & GRISWOLD LLP
1200 Huntington Center
41 S. High Street
Columbus, OH 43215
T: 614.621.1500
F: 614.621.0100
alucas@calfee.com
jblake@calfee.com

*Attorneys for Plaintiffs DCM Group, Inc. and Phani Kumar Chaluvadi*

## JURY DEMAND

Plaintiffs request a trial by the maximum number of jurors for all matters so triable.

*/s/ Albert J. Lucas*
One of the attorneys for Plaintiffs

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DCM Group, Inc. and Phani Kumar Chaluvadi

### DEFENDANTS

Ebix, Inc.

**(b)** County of Residence of First Listed Plaintiff    Essex, New Jersey
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Fulton, Georgia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Albert J. Lucas and Jason J. Blake
Calfee, Halter & Griswold LLP, 1200 Huntington Center, 41 S. High St.
Columbus, OH 43215, 614.621.1500

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
USC 1332
Brief description of cause:
Breach of contract in connection with Defendant's failure to comply with terms of purchase agreement.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE      DOCKET NUMBER

DATE
08/22/2017

SIGNATURE OF ATTORNEY OF RECORD
/s/ Albert J. Lucas

### FOR OFFICE USE ONLY

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# ASSET PURCHASE AGREEMENT

This BUSINESS TRANSFER AGREEMENT ("**Agreement**") dated 1st December 2014 is made by and between Ebix Inc. ("**Purchaser**") with its Office at 5 Concourse Pkwy Suite 3200 Atlanta GA 30328, and DCM Group Inc. with its Registered Office at 2717 Kennedy Blvd. Jersey city, NJ 07306 ("**Seller**", which expression includes its Subsidiaries).

## Recitals

A.     Seller is a software provider registered in New Jersey that is primarily engaged in offering software services and solutions to the insurance industry worldwide (the "Business").

B.     Purchaser is a company, having a wide repertoire of information technology services including but not limited to computer programming, software/development/ customization/ installation/maintenance with expertise in the provision of insurance software.

C.     Purchaser desires to acquire from Seller and Seller desires to sell and transfer to the Purchaser, the Business as an undertaking, together with all specified tangible and intangible assets, including licenses, contracts, personnel and other assets, together with Seller's intellectual property rights pertaining thereto on and subject to the terms and conditions contained in this Agreement.

NOW THEREFORE, in consideration of the recitals above, and the mutual covenants contained in this Agreement, and intending to be legally bound, Purchaser and Seller agree as follows:

## ARTICLE I

## General Provisions

1.1     **Definitions**.  Appendix A to this Agreement sets forth the definitions of certain terms used in this Agreement.

1.2     **Other Definitions and Meanings; Interpretation**.     For purposes of this Agreement, the term "Party" means (except where the context otherwise requires) Purchaser or Seller; the term "Parties" means (except where the context otherwise requires) Purchaser and Seller together; the term "person" includes any natural person, firm, association, partnership, corporation, governmental agency, or other entity other than the parties; and the words "hereof", "herein", "hereby" and other words of similar import refer to this Agreement as a whole. The headings of the Articles and Sections of this Agreement have been included for convenience of reference only and shall not be deemed to affect the meaning of the operative provisions of this Agreement.

## ARTICLE II

### Purchase and Sale

2.1    **Transaction**. On and subject to the terms and conditions of this Agreement, with effect from December 1, 2014 ("Transfer Date"), Seller sells, conveys, transfers, assigns, grants and delivers to the Purchaser and Purchaser purchases, acquires and receives from Seller, all of the, Assets, Transferred Employees, Licenses, and Contracts, as defined in Definitions Schedule relating to the Business, free and clear of all liens, mortgages, pledges, security interests, restrictions, prior assignments, encumbrances, liabilities and claims of every kind, nature or character (hereafter referred to as 'the business undertaking").

2.2    **Purchase Price**. As sole and entire consideration for the purchase of the Business undertaking, Purchaser shall pay to the Seller a purchase price of One million five hundred thousand dollars (USD 1,500,000) in addition to an earn out ("Earn Out"), on and subject to the terms of Article III herein below.

2.3    **Assets**. The term "Assets" means all tangible and intangible assets, properties, and rights used by the Seller to carry out the Business as specifically reflected in the list of Assets as set out in Exhibit 1 hereto.

Seller shall deliver to the Purchaser such bills of sale, assignments, endorsements, and other recordable instruments of assignment, transfer, conveyance, in respect of the above Assets, in form and substance reasonably satisfactory to Purchaser and its counsel, as shall be effective to vest in the Purchaser all of the right, title and interest of Seller in and to the Assets free and clear of all Liens.

2.4    **Liabilities**. The term "Liabilities" means all liabilities and obligations of the Seller as of the Transfer Date arising out of the Business. Without limiting the generality of the foregoing, it is expressly understood that the Liabilities shall not transfer from the Seller to the Purchaser.

2.5    **Contracts**. The term "Contracts" means all contracts, agreements, sub-contracts, memoranda, letter-agreements and other agreements and obligations of a similar nature arising out of or pertaining to the Business and which are to be assigned to and assumed by the Purchaser pursuant to this Agreement. Seller shall provide to the Purchaser, prior to the Transfer Date, a status report of all performed and pending obligations and under each such Contract.

2.6    **Receivables**. The term "Receivables" means all account Receivables which is outstanding for less than 181 days as of Transfer Date, associated with the Business.

2.7    **Property Lease.** The Purchaser will assume the property rental lease of the Business located at 100 Wood Avenue, Suite 105, Iselin, New Jersey from the Seller as of the date of closing.

## ARTICLE III

### Purchase Price

3.1 **Purchase Price**. For purposes hereof, the term "Purchase Price" means One million Five hundred thousand dollars (USD 1,500,000) paid at the time of closing and the Earn Out set forth below .

The Purchaser shall also pay an Earn Out to the Seller provided the following conditions are met:

- An earn out of $1 million will be paid by March 31, 2016, provided the GAAP revenues generated by the P&C Consulting Division are more than $6.5 million for the thirteen (13) month period commencing from the Transfer Date until the end of calendar year 2015
- An additional earn out of $1 million will be paid by March 31, 2017, provided the cumulative GAAP revenues generated by the P&C Consulting Division are more than $13 million in the calendar years 2015 and 2016;
  OR
  An additional earn out of $2 million will be paid by March 31, 2017, provided the cumulative GAAP revenues generated by the P&C Consulting Division are more than $14 million in the calendar years 2015 and 2016.
  OR
  An additional earn out of $4 million will be paid by March 31, 2017, provided the cumulative GAAP revenues generated by the P&C Consulting Division are more than $18 million in the calendar years 2015 and 2016.

  For clarity, it is established that GAAP revenues would be the GAAP revenues originating out of any sales to customers from the P&C Consulting Division in India and from the P&C Consulting Division in the United States. Any intercompany revenues generated by the Business units will not be counted towards the calculation of GAAP revenues.

3.2 **Payment Schedule**. The Purchase Price shall be paid by way of wire in favour of the Seller, immediately on execution of this agreement. The Seller shall upon execution of this agreement, prior to the payment, take all actions for completion of all transfer formalities i.e. (a) Transfer of control over Assets (b) Transfer of Employees (c) Transfer of Customers (d) Transfer of Suppliers.

3.3 It is clearly understood between the Parties that any amounts collected by Seller against services yet to be performed as of closing date, will belong to the Purchaser and thus should be left in the business. In case any such amount has not been left at the time of closing and is discovered later, then that amount shall be due to the Purchaser from the Seller.

## ARTICLE IV

### Employees

4.1 **Employees**. On and from the Transfer Date, each employee of the Seller employed in the conduct of the Business ("Transferred Employees") shall cease to be an employee of the Seller and shall become an employee of the Purchaser. All such Employees shall

on and from the Transfer Date, be deemed to be the employees of the Purchaser governed by and entitled to the policies, regulation, benefits, schemes of the Purchaser then prevailing.

4.2    **Employees' Compensation**.  Seller will bear the entire cost and expense of all Employees' claims for compensation or benefits (including vacation pay entitlements) arising out employment and all taxes, levies and duties related to their employment, which is related to or arising out of employment of Employees on or before the Transfer Date.

4.3    **Employees**.  The term 'Transferred Employee' shall mean a bona fide employee of the Seller who is employed in the Software Services Division.

4.4    **Employee Agreements.**  The Purchaser agrees to a two-year minimum employment term for both Mr. Kumar Chaluvadi and Mr. Venkat Vaddadi till January 1, 2017. Mr. Venkat Vaddadi will be paid an annual base salary of $130,000 in addition to health benefits similar to employees at his level. Mr. Vaddadi will also be entitled to a performance bonus opportunity of up to $30,000 linked to specific revenue goals for the Business, which for the first year shall be GAAP revenues of $6.5 Million, and prior to the first anniversary, the second year goals shall be reviewed and discussed by the Purchaser and Mr. Vaddadi. Mr. Kumar Chaluvadi will be entitled to a token salary of $50,000 in addition to health benefits similar to employees at his level. At the end of 2015, the Purchaser and Mr. Kumar Chaluvadi will endeavor to arrive at a new employment agreement that compensates him suitably as a senior employee.

4.4    **Benefit Plans**.  Purchaser either become a sponsor of any of the benefit plans of the Seller from the date of closing or will offer Transferred employees benefits as a part of the Purchaser's benefit plan. No liabilities of any existing plan till date of closing will be transferred to or assumed by Purchaser or any plan or trust maintained by Purchaser.

4.5    **Indemnity**.  Seller shall indemnify, defend and hold harmless the Purchaser, its officers, directors, employees and agents from and against all claims, demands, actions, suits and proceedings (including attorney's fees) by the Employees in respect of any action or matter arising prior to November 30, 2014.

## ARTICLE V

### Covenants, Representations and Warranties

5.1    **Seller's General Covenants, Representations and Warranties**.  Seller hereby covenants, represents and warrants to Purchaser the following:

(a)    Transfer of Licenses and Contracts.  Seller shall undertake all actions to ensure assignment and/or transfer of all Contracts and Licenses in a speedy and effective manner to the Purchaser, such assignment to be effective from the Transfer Date. Such actions shall include but not be limited to discussions and negotiations with concerned customers or right holders, execution of all necessary deeds and documents and filing of all necessary forms, filings and undertakings with appropriate authorities.

23350978.1

4

(b) <u>Organization and Existence</u>. Seller is a company duly organized, validly existing, and in good standing under the laws of India and has all the requisite power and authority to own, operate and lease its properties and to carry on the Business as now conducted.

(c) <u>Power and Authority</u>. Seller has full power and authority under its Memorandum and Articles of Association to execute, deliver, and perform this Agreement.

(d) <u>Authorization</u>. The execution, delivery and performance of this Agreement have been duly authorized by all requisite corporate actions on part of the Seller.

(e) <u>Binding Effect</u>. This Agreement is a valid, binding, and legal obligation of Seller and all agreements, instruments and documents to be executed by Seller in connection with the transactions contemplated hereby will be legal, valid and binding obligations of Seller each enforceable against the Seller in accordance with their respective terms and Seller has not made any commitment, agreement or understanding verbally or in writing to any other party for the sale of the said Business.

(f) <u>No Default</u>. Neither the execution and delivery of this Agreement nor Seller's full performance of its obligations hereunder will violate or breach, or otherwise constitute or give rise to a Default under the terms or provisions of Seller's Memorandum and Articles of Association or of any material contract, commitment, or other obligation to which the Seller is a party or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which the Seller is a party or to which Seller or the Assets are subject.

(g) <u>Ownership</u>. Seller has sole and exclusive Ownership of all tangible Assets set out in Exhibit 1 and the tangible Assets are in reasonably good condition and repair, ordinary wear and tear excepted.

(h) <u>Contracts</u>. Each of the contracts, commitments, and other obligations being assigned by Seller to Purchaser is a valid, subsisting and binding obligation of Seller and the other party or parties thereto; and neither Seller nor any other party thereto is in default under any contract, commitment, or other obligation, which default is likely to have a material and adverse effect on the Business.

(i) <u>Compliance with Laws</u>. Seller is in full compliance with all statutes, ordinances, regulations, and other governmental requirements or judicial decree applicable to the conduct of the Business.

(j) <u>Consent</u>. No consent, authorization, approval, order, license, certificate or permit or act of or from, or declaration or filing with, any foreign, federal, state, local or other governmental authority or regulatory body or any court or other tribunal to which Seller or the Business is required for the execution, delivery or performance by Seller of this Agreement or any of the other agreements instruments and documents being or to be executed and delivered hereunder or in connection herewith or for the consummation of the transactions contemplated hereby.

(k)     Title. Seller has good and marketable title to the Assets, free and clear of all Liens. Upon delivery by Seller to the Purchaser of the Assets, the Purchaser will acquire good and marketable title to the Assets free and clear of all Liens.

(l)     Litigations.     There are no pending or threatened actions, claims, litigations, suits, proceedings, inquiries, investigations instituted by or against the Seller by any employee, customer, creditor, governmental or judicial agency or any other third party which pertain to the Business or are likely to have an effect on the Business.

(m)     Representations and Warranties – True and Complete. All representations and warranties of Seller in this Agreement are true, accurate, and complete in all material respects as of the Transfer Date and as of the date hereof.

5.2     **Purchaser's Representations and Warranties**. Purchaser hereby represents and warrants to Seller the following:

(a)     Organization and Existence.  Purchaser is a company duly organized, validly existing, and in good standing under the laws of United States.

(b)     Power and Authority.  Purchaser has full corporate power and authority under its Memorandum and Articles of Association and under the laws of India to execute, deliver and perform this Agreement.

(c)     Authorization.     The execution, delivery, and performance of this Agreement have been duly authorized by all requisite corporate actions on the part of Purchaser.

(d)     Binding Effect. This Agreement is a valid, binding, and legal obligation of Purchaser and all agreements, instruments and documents to be executed by Purchaser in connection with the transactions contemplated hereby will be legal, valid and binding obligations of Purchaser each enforceable against Purchaser in accordance with their respective terms.

(e)     No Default.  Neither the execution and delivery of this Agreement nor Purchasers' full performance of its obligations hereunder will violate or breach, or otherwise constitute or give rise to a Default under, the terms or provisions of Memorandum and Articles of Association of Purchaser or of any material contract, commitment, or other obligation to which Purchaser is a party or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which Purchaser is a party.

(f)     Finders.  Purchaser has not engaged and is not directly or indirectly obligated to any person acting as a broker, finder, financial advisor, or in any other similar capacity in connection with the transactions contemplated hereby.

(g)     Consent. No consent, authorization, approval, order, license, certificate or permit or act of or from, or declaration or filing with, any foreign, federal, state, local or other governmental authority or regulatory body or any court or other tribunal to which the Purchaser is subject, is required for the execution, delivery or performance by Purchaser of this Agreement

23350978.1

6

or any of the other agreements, instruments and documents being or to be executed and delivered hereunder or in connection herewith or for the consummation of the transactions contemplated hereby.

      (h)    <u>Representations and Warranties – True and Complete</u>. All representations and warranties of Purchaser in this Agreement are true, accurate, and complete in all material respects as of the date hereof.

    5.3    **Survival**. The parties' respective covenants, representations, and warranties contained in this Agreement will survive the execution and delivery of this Agreement and performance by the Parties of their respective obligations hereunder.

## ARTICLE VI

### Covenants of the Parties

    6.1    **Further Actions**. After the execution of this agreement, Seller will, execute and deliver to Purchaser (or cause to be executed and delivered to Purchaser), such additional instruments and Seller shall take such other and further actions as Purchaser may reasonably request and which are ordinarily provided by a seller, to more completely sell, transfer, and assign to Purchaser and vest in Purchaser Ownership to the Business. Each Party will bear its respective costs in respect of such further actions.

    6.2    **Audit Rights.** Upon notice to the Purchaser, Seller shall have the right to audit the books and records of the Purchaser at its own expense, solely for the purpose of verifying the Earn Out calculation.

    6.3    **Adjustment for Prepaids, AR and Deferred Revenues.** Seller and Purchaser agree to a period of 60 days from the closing date within which the necessary adjustments for cash items like Prepaids, AR and Deferred Revenues will be reviewed by the Purchaser. All debt including Loan payments, vendor debts, employee payables, vendor payables, leave accruals, bonus, and commissions till date of closing shall be paid for by the Sellers. In case Seller has collected advance for any business that has still to be serviced, then it will leave cash for Purchaser for any unperformed obligations as of closing date for existing customers from whom money has been collected. All receivables for work already performed till 30th November, will belong to the Seller once the Purchaser has verified the calculations and the basis for it.

    6.4    **Records**. Seller will handover to the Purchaser all the records of the Business.

## ARTICLE VII

### Conditions

    7.1.    **Conditions to Purchaser's Obligations**. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions at or before the execution of this Agreement:

(a)     The representations and warranties of Seller contained in this Agreement shall be true, accurate, and complete in all material respects as of the date hereof and as of the Transfer Date (as if such representations and warranties had been made as of the Transfer Date);

(b)     Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or satisfied by Seller, and Seller shall have delivered to Purchaser all documents, certificates, and instruments required to be delivered by Seller under the terms of this Agreement; and,

(c)     All corporate and other proceedings or actions to be taken by Seller in connection with the transactions contemplated by this Agreement and that certain Business Transfer Agreement as of the same date between Ebix, Inc. subsidiary Ebix Software India Pvt. Ltd. and 13 Software Pvt. Ltd., and all documents incidental thereto, shall be satisfactory in form and substance to Purchaser.

## ARTICLE VIII

### Indemnification

8.1     **Indemnification of Purchaser**.    Seller will indemnify, defend, and hold Purchaser, its officers, directors, employees and agents harmless from and against any and all liabilities, damages, losses, suits, claims, costs, and expenses (including attorneys' fees) arising out of or resulting from (a) any misrepresentation or breach of warranty or covenant by Seller; or (b) nonperformance by Seller of any obligation to be performed on the part of Seller under this Agreement; or (c) any claim or injunction from third parties relating to hardware, software, service or maintenance agreements, or software or hardware licenses provided to Purchaser by Seller for the operation of the Business; or (d) any breach or non compliance with any statutes, Ordinances, regulations, and other governmental requirements or judicial decree by the Seller; or (e) any actions, claims, litigations, suits, proceedings, inquiries, investigations brought by any employee, customer, creditor, governmental or judicial agency or any other third party arising out of any acts or omissions of the Seller prior to the Transfer Date.

## ARTICLE IX

### Non Compete

9.1     **Non-Compete**.   In consideration for the purchase of the Business, including the goodwill connected therewith, by the Purchaser, Seller agrees for a period of seven years from the Transfer Date, not to directly or through an associate/Agent carry on or cause to carry on any business which is in competition with the Business.

## ARTICLE X

### Miscellaneous

10.1     **Amendment**.   This Agreement may be amended only by written instrument executed by both Parties to this Agreement.

23350978.1

10.2 **Waiver**. Either Party may at any time waive compliance by the other Party with any covenants or conditions contained in this Agreement, but only by written instrument executed by the Party waiving such compliance. No such waiver, however, shall be deemed to constitute the waiver of any such covenant or condition in any other circumstance or the waiver of any other covenant or condition.

10.3 **Cooperation**. Purchaser and Seller will each cooperate with the other Party, at the other Party's request and expense, in furnishing information, testimony, and other assistance in connection with any actions, proceedings, arrangements, and disputes with other persons or governmental inquiries or investigations involving Seller's conduct of the Business or the transactions contemplated hereby.

10.4 **Confidentiality**. Each Party agrees to keep confidential all information and date pertaining to the other Party that is disclosed to it pursuant to or in connection with this Agreement, including the terms of this Agreement and agrees not to, disclose or furnish to, or use for the benefit of any person, firm, partnership or corporation such information without the prior written consent of the Party which owns such information or data.

10.5 **Severability**. If any provision of this Agreement shall finally be determined to be unlawful, then such provision shall be deemed to be severed from this Agreement and every other provision of this Agreement shall remain in full force and effect.

10.6 **Expenses**. Each Party will bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

10.7 **Transfer Taxes**. Each party will pay its own taxes, which may result from the transfer of the Business from Seller to Purchaser.

10.8 **Notices**. All notices, requests and other communications hereunder shall be in writing and shall be deemed to have been duly given at the time of receipt if delivered by hand or communicated by electronic transmission, or, if mailed, three (3) days after mailing registered or certified mail, return receipt requested with postage prepaid:

If to Purchaser, to:

Ebix Inc.
5 Concourse Parkway
Suite 3200
Atlanta, GA 30328

If to Seller, to:

DCM Group Inc.
2717 Kennedy Blvd.

23350978.1

9

Jersey city, New Jersey 07306

Provided however, that if either Party shall have designated a different address by notice to the other given as provided above, then to the last address so designated.

10.9  **Assignment**.  This Agreement shall be binding upon and inure to the benefit of the successors of each of the Parties to this Agreement, but shall not be assignable by either Party without the prior written consent of the other.

10.10  **No Third Parties**.  Neither this Agreement nor any provisions set forth herein is intended to, or shall, create any rights in or confer any benefits upon any person other than the Parties to this Agreement.

10.11  **Governing Law**.  This Agreement will be governed by and construed in accordance with the laws of United States. The Parties shall refer any disputes arising between them which relate to this Agreement or transactions contemplated hereby to arbitration to be conducted in accordance with the Arbitration and Conciliation Act, 1996. The venue of arbitration shall be courts of Atlanta, Georgia. The courts of Atlanta shall have jurisdiction over the Parties.

10.12  **Press Releases**.  Each Party agrees not to issue press releases or public announcements concerning the terms of this Agreement without the prior written approval of the other Party. The existence and terms of this Agreement are confidential and shall not be disclosed to a third party by any Party other than through such agreed upon press release. However, this shall not restrict any statutory requirements under the US Laws, including disclosure requirements of SEC and the Stock exchanges.

10.13  **Counterparts**.  More than one counterpart of this Agreement may be executed by the Parties to this Agreement, and each fully executed counterpart shall be deemed an original without production of the others.

10.14  **Complete Agreement**.  This Agreement sets forth the entire understanding of the Parties to this Agreement with respect to the subject matter hereof and supersedes all prior letters of intent, agreements, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee, or representative of either Party relating thereto.

## ARTICLE XI

### Savings

11.1  Notwithstanding any other provision in this Agreement, the Parties hereto agree that time is of essence in connection with this Agreement and the transaction envisaged under this Agreement shall be completed on or before December 1, 2014.

23350978.1

*[Signatures begin on following page]*

23350978.1

**IN WITNESS WHEREOF**, Seller and Purchaser have each caused this Agreement to be executed by their respective duly authorized officers and have caused their respective corporate seals to be affixed and attested, all as of the date first above written.

**EBIX, INC.**

By:

Name: Robin Raina

Title: President & CEO

**DCM GROUP INC.**

By:

Name: PRAO KUMAR CRALKUADI

Title: PRESIDENT

**WITNESSES**

1._____ _____ _____

Name:_____

2._____

Name:_____.

23350978.1                    12

Appendix A

CERTAIN DEFINITIONS

The following terms have the meanings set forth below where used in the Agreement and identified with initial capital letters:

| | |
|---|---|
| **Assets** | As defined in Section 2.3 of the Agreement. |
| **Adjustment** | As determined under Section 3.3 of the Agreement. |
| **Business** | Shall be defined as all of the actions conducted by the Seller since its inception. |
| **Contracts** | As defined in Section 2.5 of the Agreement |
| **Liabilities** | As defined In Section 2.4 to the Agreement. |
| **Receivables** | As defined in Section 2.6 to the Agreement |
| **Transfer Date** | As defined in Section 2.1 of the Agreement. |
| **Default** | An occurrence which constitutes a breach or default under a contract, order, or other commitment, after the expiration of any grace period provided without cure. |
| **Lien** | Any encumbrance or lien, including, without limitation, any mortgage, judgment lien, material man's lien, mechanic's lien, security interest, encroachment, easement, or other restriction, in each case having a material adverse effect on the thing or right so encumbered. |
| **Material Event** | Any event, condition, circumstance, or occurrence which has had a material and adverse effect on the Business or the properties, assets, liabilities, (fixed or otherwise) or condition (financial or otherwise) of the Business |
| **Ownership** | Such ownership as confers upon the person having it good and marketable title to and control over the thing or right owned, free and clear of any and all Encumbrances. |
| **Purchaser** | As defined in the Preamble of the Agreement. |
| **Purchase Price** | As defined in Section 3.1 of the Agreement. |
| **Transferred Employees** | As defined in Section 4.3 of the Agreement. |
| **Seller** | As defined in the Preamble to the Agreement. |

23350978.1

SCHEDULE A

| No | Description | File Name / Comments |
|---|---|---|
| 3 | List of all customer contracts with summary values etc | 1. List of all customer contracts with summary values.xls |
| 4 | All customer contracts | 1. Customer Contracts.zip |
| 5 | List of all employees with salary details | 1. List of all employees with salary details.xls |
| 6 | Payroll data for employees | 1. Payroll data for employees – USA – January 2014 to Oct 2014.xls<br>2. Payroll data for employees – India Apr2014 to Oct2014 |
| 7 | Benefit policy data | 1. Benefit policy data.xls |
| 8 | List of any insurance held with details | 1. List of any insurance held with details.doc<br>2. DCM Group_Starmark Plan.pdf |
| 9 | List of bank accounts with details | 1. List of bank accounts with details.doc |
| 10 | Confirmation that no special employee agreements are there. | **No Special Agreements** |
| 11 | List of all staffing vendors consultants and their monthly contract/data details | 1. List of all staffing vendors, consultants and their monthly contract data details.xls |
| 12 | All staffing contracts | 1. Staffing Contracts.zip |
| 13 | List of all software assets with relevant license numbers | 1. List of all software assets with relevant license numbers.xls |
| 14 | List of all fixed assets | **No Fixed Assets** |

23350978.1

| 15 | List of all website domain names | 1. List of all website domain names.xls |
|----|----|----|
| 16 | List of any trademarks | **No Trademarks** |
| 17 | List of any quality certifications | 1. i3 Software ISO ertificate.pdf |
| 18 | Interim P&L financials sheet as of 30th nov. 2014 | 1. I3 Software Consolidated P&L Statement. Xls |
| 19 | Billable vs. non-billable employees report as of 30th Nov. 2014 | 1. Billable vs. non-billable employees report.xls |
| 20 | Financials of both companies for 2013 and 2012 | 1. DCM GROUP INC BS 2012.pdf<br>2. DCM GROUP INC BS 2013.pdf<br>3. DCM GROUP INC P&L 2012.pdf<br>4. DCM GROUP INC P&L 2013.pdf<br>5. India 2012-13 Schedules.pdf<br>6. India 2012-13.pdf<br>7. India 2013-14 Schedules.pdf<br>8. India 2013-14.pdf |
| 21 | Confirmation that you are not aware of pending customer terminations | **No Customer Terminations** |
| 22 | List of all vendor agreements and details on those contracts. | 1. List of all vendor agreements and details on those contracts.xls |
| 23 | India Office Lease Agreement | 1. Hyderabad - Office Lease Deed.pdf |
| 24 | USA NJ Office Lease Agreement | 1. New Jersey - Office Lease Agreement.pdf |
| 25 | Revenues and Expenses 2014 | 1. Revenues and Expenses 2014.xls |
| 26 | Expenses Analysis | 1. Expense Analysis - Jan to Sep 2014. Xls |

23350978.1

## BUSINESS TRANSFER AGREEMENT

This BUSINESS TRANSFER AGREEMENT ("**Agreement**") dated 1st December 2014 is made by and between Ebix India Software Private Limited. ("**Purchaser**") with its Office at 122 & 123, N.S.E.Z., Phase-II, Noida-201305, Uttar Pradesh, India, and i3 Software Private Limited with its Registered Office at 1st Floor, DSR Corporate Center, 1-90/B/C/4/A, Plot # 1 & 2, Patrikanagar, Hitech City, Madhapur, Hyderabad -500 081, Telangana , India ("**Seller**", which expression includes its Subsidiaries).

### Recitals

A. Seller is a software provider registered in India that is primarily engaged in offering software services and solutions to the insurance industry worldwide (the "Business").

B. Purchaser is a company, having a wide repertoire of information technology services including but not limited to computer programming, software/development/ customization/ installation/maintenance with expertise in the provision of insurance software.

C. Purchaser desires to acquire from Seller and Seller desires to sell and transfer to the Purchaser, the Business as an undertaking, together with all specified tangible and intangible assets, including licenses, contracts, personnel and other assets, together with Seller's intellectual property rights pertaining thereto on and subject to the terms and conditions contained in this Agreement.

NOW THEREFORE, in consideration of the recitals above, and the mutual covenants contained in this Agreement, and intending to be legally bound, Purchaser and Seller agree as follows:

### ARTICLE I

### General Provisions

1.1 **Definitions**. Appendix A to this Agreement sets forth the definitions of certain terms used in this Agreement.

1.2 **Other Definitions and Meanings; Interpretation**. For purposes of this Agreement, the term "Party" means (except where the context otherwise requires) Purchaser or Seller; the term "Parties" means (except where the context otherwise requires) Purchaser and Seller together; the term "person" includes any natural person, firm, association, partnership, corporation, governmental agency, or other entity other than the parties; and the words "hereof", "herein", "hereby" and other words of similar import refer to this Agreement as a whole. The headings of the Articles and Sections of this Agreement have been included for convenience of reference only and shall not be deemed to affect the meaning of the operative provisions of this Agreement.

## ARTICLE II

### Purchase and Sale

2.1     **Transaction**. On and subject to the terms and conditions of this Agreement, with effect from December 1, 2014 ("Transfer Date"), Seller sells, conveys, transfers, assigns, grants and delivers to the Purchaser and Purchaser purchases, acquires and receives from Seller, all of the, Assets, Transferred Employees, Licenses, and Contracts, as defined in Definitions Schedule relating to the Business, free and clear of all liens, mortgages, pledges, security interests, restrictions, prior assignments, encumbrances, liabilities and claims of every kind, nature or character (hereafter referred to as 'the business undertaking'.;

2.2     **Purchase Price**. As sole and entire consideration for the purchase of the Business undertaking, Purchaser shall pay to the Seller a purchase price of INR 311,20,000 (Indian Rupees Three crores eleven lacs twenty thousand only) (Rupee Equivalent of USD 0.5 million converted @ Rs.62.24 per USD) on and subject to the terms of Article III herein below.

2.3     **Assets**. The term "Assets" means all tangible and intangible assets, properties, and rights used by the Seller to carry out the Business as specifically reflected in the list of Assets as set out in Exhibit 1 hereto.

Seller shall deliver to the Purchaser such bills of sale, assignments, endorsements, and other recordable instruments of assignment, transfer, conveyance, in respect of the above Assets, in form and substance reasonably satisfactory to Purchaser and its counsel, as shall be effective to vest in the Purchaser all of the right, title and interest of Seller in and to the Assets free and clear of all Liens.

2.4     **Liabilities**. The term "Liabilities" means all liabilities and obligations of the Seller as of the Transfer Date arising out of the Business. Without limiting the generality of the foregoing, it is expressly understood that the Liabilities shall not transfer from the Seller to the Purchaser.

2.5     **Contracts**. The term "Contracts" means all contracts, agreements, sub-contracts, memoranda, letter-agreements and other agreements and obligations of a similar nature arising out of or pertaining to the Business and which are to be assigned to and assumed by the Purchaser pursuant to this Agreement. Seller shall provide to the Purchaser, prior to the Transfer Date, a status report of all performed and pending obligations and under each such Contract.

2.6     **Receivables**. The term "Receivables" means all account Receivables which is outstanding for less than 181 days as of Transfer Date, associated with the Business.

2.7     **Property Lease.** The Purchaser will assume the property rental lease of the Business located at 1st Floor, DSR Corporate Center, 1-90/B/C/4/A, Plot # 1 & 2, Patrikanagar, Hitech City, Madhapur, Hyderabad -500 081, Telangana , India  from the Seller as of the date of closing.

23350978.1

2

# ARTICLE III

## Purchase Price

    3.1   **Purchase Price**. For purposes hereof, the term "Purchase Price" means INR INR 311,20,000 (Indian Rupees Three crores eleven lacs twenty thousand only) (Rupee Equivalent of USD 0.5 million converted @ Rs._62.24 per USD)

    3.2   **Payment Schedule**. The Purchase Price shall be paid by way of wire or Crossed Account Payee Cheques at Hyderabad, in favour of the Seller, immediately on execution of this agreement. The Seller shall upon execution of this agreement, prior to the payment, take all actions for completion of all transfer formalities i.e. (a) Transfer of control over Assets (b) Transfer of Employees (c) Transfer of Customers (d) Transfer of Suppliers.

    3.3   It is clearly understood between the Parties that any amounts collected by Seller against services yet to be performed as of closing date, will belong to the Purchaser and thus should be left in the business. In case any such amount has not been left at the time of closing and is discovered later, then that amount shall be due to the Purchaser from the Seller.

# ARTICLE IV

## Employees

    4.1   **Employees**. On and from the Transfer Date, each employee of the Seller employed in the conduct of the Business ("Transferred Employees") shall cease to be an employee of the Seller and shall become an employee of the Purchaser. All such Employees shall on and from the Transfer Date, be deemed to be the employees of the Purchaser governed by and entitled to the policies, regulation, benefits, schemes of the Purchaser then prevailing.

    4.2   **Employees' Compensation**. Seller will bear the entire cost and expense of all Employees' claims for compensation or benefits (including vacation pay entitlements) arising out employment and all taxes, levies and duties related to their employment, which is related to or arising out of employment of Employees on or before the Transfer Date.

    4.3   **Employees**. The term 'Transferred Employee' shall mean a bona fide employee of the Seller who is employed in the Software Services Division.

    4.4   **Benefit Plans**. Purchaser will not become a sponsor of any of the benefit plans of the Seller and no assets or liabilities of any such plan will be transferred to or assumed by Purchaser or any plan or trust maintained by Purchaser.

    4.5   **Indemnity**. Seller shall indemnify, defend and hold harmless the Purchaser, its officers, directors, employees and agents from and against all claims, demands, actions, suits and proceedings (including attorney's fees) by the Employees in respect of any action or matter arising prior to November 30, 2014.

# ARTICLE V

## Covenants, Representations and Warranties

23350978.1

3

5.1 **Seller's General Covenants, Representations and Warranties.** Seller hereby covenants, represents and warrants to Purchaser the following:

(a) Transfer of Licenses and Contracts. Seller shall undertake all actions to ensure assignment and/or transfer of all Contracts and Licenses in a speedy and effective manner to the Purchaser, such assignment to be effective from the Transfer Date. Such actions shall include but not be limited to discussions and negotiations with concerned customers or right holders, execution of all necessary deeds and documents and filing of all necessary forms, filings and undertakings with appropriate authorities.

(b) Organization and Existence. Seller is a company duly organized, validly existing, and in good standing under the laws of India and has all the requisite power and authority to own, operate and lease its properties and to carry on the Business as now conducted.

(c) Power and Authority. Seller has full power and authority under its Memorandum and Articles of Association to execute, deliver, and perform this Agreement.

(d) Authorization. The execution, delivery and performance of this Agreement have been duly authorized by all requisite corporate actions on part of the Seller.

(e) Binding Effect. This Agreement is a valid, binding, and legal obligation of Seller and all agreements, instruments and documents to be executed by Seller in connection with the transactions contemplated hereby will be legal, valid and binding obligations of Seller each enforceable against the Seller in accordance with their respective terms and Seller has not made any commitment, agreement or understanding verbally or in writing to any other party for the sale of the said Business.

(f) No Default. Neither the execution and delivery of this Agreement nor Seller's full performance of its obligations hereunder will violate or breach, or otherwise constitute or give rise to a Default under the terms or provisions of Seller's Memorandum and Articles of Association or of any material contract, commitment, or other obligation to which the Seller is a party or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which the Seller is a party or to which Seller or the Assets are subject.

(g) Intentionally omitted.

(h) Ownership. Seller has sole and exclusive Ownership of all tangible Assets set out in Exhibit 1 and the tangible Assets are in reasonably good condition and repair, ordinary wear and tear excepted.

(i) Contracts. Each of the contracts, commitments, and other obligations being assigned by Seller to Purchaser is a valid, subsisting and binding obligation of Seller and the other party or parties thereto; and neither Seller nor any other party thereto is in default under any contract, commitment, or other obligation, which default is likely to have a material and adverse effect on the Business.

23350978.1

4

(j)     Compliance with Laws.  Seller is in full compliance with all statutes, ordinances, regulations, and other governmental requirements or judicial decree applicable to the conduct of the Business.

(k)     Consent.  No consent, authorization, approval, order, license, certificate or permit or act of or from, or declaration or filing with, any foreign, federal, state, local or other governmental authority or regulatory body or any court or other tribunal to which Seller or the Business is required for the execution, delivery or performance by Seller of this Agreement or any of the other agreements instruments and documents being or to be executed and delivered hereunder or in connection herewith or for the consummation of the transactions contemplated hereby.

(l)     Title.  Seller has good and marketable title to the Assets, free and clear of all Liens. Upon delivery by Seller to the Purchaser of the Assets, the Purchaser will acquire good and marketable title to the Assets free and clear of all Liens.

(m)     Litigations.     There are no pending or threatened actions, claims, litigations, suits, proceedings, inquiries, investigations instituted by or against the Seller by any employee, customer, creditor, governmental or judicial agency or any other third party which pertain to the Business or are likely to have an effect on the Business.

(n)     Representations and Warranties – True and Complete.  All representations and warranties of Seller in this Agreement are true, accurate, and complete in all material respects as of the Transfer Date and as of the date hereof.

5.2     **Purchaser's Representations and Warranties**.  Purchaser hereby represents and warrants to Seller the following:

(a)     Organization and Existence.  Purchaser is a company duly organized, validly existing, and in good standing under the laws of India.

(b)     Power and Authority.  Purchaser has full corporate power and authority under its Memorandum and Articles of Association and under the laws of India to execute, deliver and perform this Agreement.

(c)     Authorization.    The execution, delivery, and performance of this Agreement have been duly authorized by all requisite corporate actions on the part of Purchaser.

(d)     Binding Effect.  This Agreement is a valid, binding, and legal obligation of Purchaser and all agreements, instruments and documents to be executed by Purchaser in connection with the transactions contemplated hereby will be legal, valid and binding obligations of Purchaser each enforceable against Purchaser in accordance with their respective terms.

(e)     No Default.  Neither the execution and delivery of this Agreement nor Purchasers' full performance of its obligations hereunder will violate or breach, or otherwise

23350978.1

5

constitute or give rise to a Default under, the terms or provisions of Memorandum and Articles of Association of Purchaser or of any material contract, commitment, or other obligation to which Purchaser is a party or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which Purchaser is a party.

(f)     Finders.    Purchaser has not engaged and is not directly or indirectly obligated to any person acting as a broker, finder, financial advisor, or in any other similar capacity in connection with the transactions contemplated hereby.

(g)     Consent.    No consent, authorization, approval, order, license, certificate or permit or act of or from, or declaration or filing with, any foreign, federal, state, local or other governmental authority or regulatory body or any court or other tribunal to which the Purchaser is subject, is required for the execution, delivery or performance by Purchaser of this Agreement or any of the other agreements, instruments and documents being or to be executed and delivered hereunder or in connection herewith or for the consummation of the transactions contemplated hereby.

(h)     Representations and Warranties – True and Complete.    All representations and warranties of Purchaser in this Agreement are true, accurate, and complete in all material respects as of the date hereof.

5.3     **Survival**.    The parties' respective covenants, representations, and warranties contained in this Agreement will survive the execution and delivery of this Agreement and performance by the Parties of their respective obligations hereunder.

## ARTICLE VI

### Covenants of the Parties

6.1     **Further Actions**.    After the execution of this agreement, Seller will, execute and deliver to Purchaser (or cause to be executed and delivered to Purchaser), such additional instruments and Seller shall take such other and further actions as Purchaser may reasonably request and which are ordinarily provided by a seller, to more completely sell, transfer, and assign to Purchaser and vest in Purchaser Ownership to the Business. Each Party will bear its respective costs in respect of such further actions.

6.2     **Records**.    Seller will handover to the Purchaser all the records of the Business.

6.3     **Adjustment for Prepaids, AR and Deferred Revenues.**    Seller and Purchaser agree to a period of 60 days within which the necessary adjustments for cash items like Prepaids, AR and Deferred Revenues will be reviewed by the Purchaser. All debt including Loan payments, vendor debts, employee payables, vendor payables, leave accruals, bonus, and commissions till date of closing shall be paid for by the Sellers. In case Seller has collected advance for any business that has still to be serviced, then it will leave cash for Purchaser for any unperformed obligations as of closing date for existing customers from whom money has been collected. All receivables for work already performed till 30th November, will belong to the Seller once the Purchaser has verified the calculations and the basis for it.

23350978.1

6

## ARTICLE VII

### Conditions

7.1 **Conditions to Purchaser's Obligations**. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions at or before the execution of this Agreement:

(a) The representations and warranties of Seller contained in this Agreement shall be true, accurate, and complete in all material respects as of the date hereof and as of the Transfer Date (as if such representations and warranties had been made as of the Transfer Date);

(b) Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or satisfied by Seller, and Seller shall have delivered to Purchaser all documents, certificates, and instruments required to be delivered by Seller under the terms of this Agreement; and,

(c) All corporate and other proceedings or actions to be taken by Seller in connection with the transactions contemplated by this Agreement and that certain Asset Purchase Agreement as of the same date between Ebix, Inc. and DCM Group Inc., and all documents incidental thereto, shall be satisfactory in form and substance to Purchaser.

## ARTICLE VIII

### Indemnification

8.1 **Indemnification of Purchaser**. Seller will indemnify, defend, and hold Purchaser, its officers, directors, employees and agents harmless from and against any and all liabilities, damages, losses, suits, claims, costs, and expenses (including attorneys' fees) arising out of or resulting from (a) any misrepresentation or breach of warranty or covenant by Seller;or (b) nonperformance by Seller of any obligation to be performed on the part of Seller under this Agreement; or (c) any claim or injunction from third parties relating to hardware, software, service or maintenance agreements, or software or hardware licenses provided to Purchaser by Seller for the operation of the Business; or (d) any breach or non compliance with any statutes, Ordinances, regulations, and other governmental requirements or judicial decree by the Seller; or (e) any actions, claims, litigations, suits, proceedings, inquiries, investigations brought by any employee, customer, creditor, governmental or judicial agency or any other third party arising out of any acts or omissions of the Seller prior to the Transfer Date.

## ARTICLE IX

### Non Compete

9.1 **Non-Compete**. In consideration for the purchase of the Business, including the goodwill connected therewith, by the Purchaser, Seller agrees for a period of seven years from the Transfer Date, not to directly or through an associate/Agent carry on or cause to carry on any business which is in competition with the Business.

23350978.1

## ARTICLE X

### Miscellaneous

10.1  **Amendment**.  This Agreement may be amended only by written instrument executed by both Parties to this Agreement.

10.2  **Waiver**.  Either Party may at any time waive compliance by the other Party with any covenants or conditions contained in this Agreement, but only by written instrument executed by the Party waiving such compliance. No such waiver, however, shall be deemed to constitute the waiver of any such covenant or condition in any other circumstance or the waiver of any other covenant or condition.

10.3  **Cooperation**.  Purchaser and Seller will each cooperate with the other Party, at the other Party's request and expense, in furnishing information, testimony, and other assistance in connection with any actions, proceedings, arrangements, and disputes with other persons or governmental inquiries or investigations involving Seller's conduct of the Business or the transactions contemplated hereby.

10.4  **Confidentiality**.  Each Party agrees to keep confidential all information and date pertaining to the other Party that is disclosed to it pursuant to or in connection with this Agreement, including the terms of this Agreement and agrees not to, disclose or furnish to, or use for the benefit of any person, firm, partnership or corporation such information without the prior written consent of the Party which owns such information or data.

10.5  **Severability**.  If any provision of this Agreement shall finally be determined to be unlawful, then such provision shall be deemed to be severed from this Agreement and every other provision of this Agreement shall remain in full force and effect.

10.6  **Expenses**.  Each Party will bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

10.7  **Transfer Taxes**.  Each party will bear its own taxes, which may result from the transfer of the Business from Seller to Purchaser.

10.8  **Notices**.  All notices, requests and other communications hereunder shall be in writing and shall be deemed to have been duly given at the time of receipt if delivered by hand or communicated by electronic transmission, or, if mailed, three (3) days after mailing registered or certified mail, return receipt requested with postage prepaid:

If to Purchaser, to:

Ebix Software India Pvt. Ltd.
122 & 123,
N.S.E.Z., Phase-II,

23350978.1

NOIDA-201305
U.P. INDIA

If to Seller, to:

1st Floor, DSR Corporate Center
1-90/B/C/4/A, Plot # 1 & 2
Patrikanagar, Hitech City,
Madhapur Hyderabad -500 081.
A.P, INDIA

Provided however, that if either Party shall have designated a different address by notice to the other given as provided above, then to the last address so designated.

10.9   **Assignment**.  This Agreement shall be binding upon and inure to the benefit of the successors of each of the Parties to this Agreement, but shall not be assignable by either Party without the prior written consent of the other.

10.10  **No Third Parties**.  Neither this Agreement nor any provisions set forth herein is intended to, or shall, create any rights in or confer any benefits upon any person other than the Parties to this Agreement.

10.11  **Governing Law**.   This Agreement will be governed by and construed in accordance with the laws of India. The Parties shall refer any disputes arising between them which relate to this Agreement or transactions contemplated hereby to arbitration to be conducted in accordance with the Arbitration and Conciliation Act, 1996. The venue of arbitration shall be New Delhi. The courts of New Delhi shall have jurisdiction over the Parties.

10.12  **Press Releases**.   Each Party agrees not to issue press releases or public announcements concerning the terms of this Agreement without the prior written approval of the other Party. The existence and terms of this Agreement are confidential and shall not be disclosed to a third party by any Party other than through such agreed upon press release. However, this shall not restrict any statutory requirements under the Indian and US Law, including disclosure requirements of SEBI, SEC and Stock exchanges.

10.13  **Counterparts**.  More than one counterpart of this Agreement may be executed by the Parties to this Agreement, and each fully executed counterpart shall be deemed an original without production of the others.

10.14  **Complete Agreement**. This Agreement sets forth the entire understanding of the Parties to this Agreement with respect to the subject matter hereof and supersedes all prior letters

23350978.1

**IN WITNESS WHEREOF**, Seller and Purchaser have each caused this Agreement to be executed by their respective duly authorized officers and have caused their respective corporate seals to be affixed and attested, all as of the date first above written.

**EBIX INDIA SOFTWARE PRIVATE LIMITED**

By:
Name:  Robin Raina
Title:    President

**i3 SOFTWARE PVT. LIMITED**

By: Madhavi Chaluvadi
Name: Madhavi Chaluvadi
Title: Director

**WITNESSES**

1._____
   Name:_____

2._____
   Name:_____

23350978.1

11

Appendix A

CERTAIN DEFINITIONS

The following terms have the meanings set forth below where used in the Agreement and
identified with initial capital letters:

| | |
|---|---|
| **Assets** | As defined in Section 2.3 of the Agreement. |
| **Adjustment** | As determined under Section 3.3 of the Agreement. |
| **Business** | As defined in the recital section of this Agreement. |
| **Contracts** | As defined in Section 2.5 of the Agreement |
| **Liabilities** | As defined In Section 2.4 to the Agreement. |
| **Receivables** | As defined in Section 2.6 to the Agreement |
| **Transfer Date** | As defined in Section 2.1 of the Agreement. |
| **Default** | An occurrence which constitutes a breach or default under a contract, order, or other commitment, after the expiration of any grace period provided without cure. |
| **Lien** | Any encumbrance or lien, including, without limitation, any mortgage, judgment lien, material man's lien, mechanic's lien, security interest, encroachment, easement, or other restriction, in each case having a material adverse effect on the thing or right so encumbered. |
| **Material Event** | Any event, condition, circumstance, or occurrence which has had a material and adverse effect on the Business or the properties, assets, liabilities, (fixed or otherwise) or condition (financial or otherwise) of the Business |
| **Ownership** | Such ownership as confers upon the person having it good and marketable title to and control over the thing or right owned, free and clear of any and all Encumbrances. |
| **Purchaser** | As defined in the Preamble of the Agreement. |
| **Purchase Price** | As defined in Section 3.1 of the Agreement. |
| **Transferred Employees** | As defined in Section 4.3 of the Agreement. |
| **Seller** | As defined in the Preamble to the Agreement. |

23350978.1

EXHIBITS (Enclosed)

1. Expense Analysis Report
2. Hyderabad Office Lease Deed
3. ISO Certificate
4. P&L for 2012-13
5. P&L for 2013-14
6. Payroll data for Company
7. List of all assets
8. Insurance Held
9. Bank Account Details
10. Estimated P&L till 30th September 2014 for Company

23350978.1